# CHARLESTON.

ROBERT COCHRAN *v.* GEORGE F. CRAIG *et als.*

Submitted March 15, 1921.   Decided March 22, 1921.

1.   TRIAL—*Motion to Strike Out Evidence, Part of Which Was Admissible, Properly Denied.*

Motions made in the progress of a trial involving several issues, to strike out certain portions of relevant, material and probative evidence, appreciably tending to maintain some of the issues on the part of the adverse party, on the ground of its insufficiency for such purpose, are properly overruled. (p. 295).

2.   SAME—*Court Cannot Be Required to Test Sufficiency of Evidence of Opposite Party Piecemeal.*

A party to a trial before a jury has no right to require the court to pass upon or test the sufficiency of the evidence of the opposite party, by piecemeal, unless, perhaps, in a case in which the evidence constituting the subject matter of the motion to strike out or exclude, is the only evidence tending to prove his opponent's case and is clearly insufficient. Ordinarily, he can require a judicial test of the sufficiency of evidence, only by a motion to exclude all of it, a demurrer to evidence or a motion for a new trial, made after verdict. (p. 295).

3.   SAME—*Introduction of Evidence by Defendant Waiver of Errors in Overruling Motion to Exclude Plaintiff's Evidence.*

If, after the overruling of a motion to exclude the plaintiff's evidence, interposed at the conclusion of the introduction thereof, the defendant introduces his evidence, he thereby waives the error in the ruling, if any, and cannot have a review thereof in the appellate court.   (p. 296).

4.   ASSUMPSIT, ACTION OF—*Proof Sustaining Substantial Portion of Estimated Cost Sued for Admissible.*

In an action to recover a sum of money equal to what certain work would have cost, if performed, upon the hypothe-

sis of an agreement to pay such sum, proof of a substantial
portion of such estimated cost is admissible, notwithstand-
ing its insufficiency to establish the full or exact amount
thereof, and the inability of the plaintiff to do so by other
evidence. (p. 296).

5. PLEADING—*Party Claiming Alternative Right of Recovery May
    Assert Both Claims in Same Action.*

    A party claiming an alternative right of recovery may as-
sert and prosecute both claims in the same action, leaving it
to the court and jury to determine which he is entitled to, if
either, and proof of one of them constitutes no abandonment
of the other. (p. 296).

6. ESTOPPEL—*Representation That Claim in Action Amounts to
    Less Than That Sued for Not An Estoppel.*

    A representation that a claim in action amounts to a cer-
tain sum less than that sued for, not acted upon in any way,
is not an estoppel. It is mere evidence to be taken by the
jury for what it is worth. (p. 296).

7. CONTRACTS—*Recovery Under quantum Meruit Admissible Un-
    der Declaration Containing Common Counts As Well As
    Special Counts.*

    If a declaration contains the common counts as well as a
special count based upon an agreement therein alleged, evi-
dence tending to prove a right of recovery on a *quantum
meruit* is admissible, notwithstanding reliance in the trial
upon evidence tending to prove the agreement alleged. (p. 297).

8. EVIDENCE—*Opinion As to Value or Quantity Admissible if
    Witness Has More Knowledge of Subject Than Jurors.*

    To make the opinion of a witness, as to value or quantity,
admissible in evidence, he need not be qualified in the high-
est degree, nor in any particular degree. It suffices that he
has more knowledge of the subject matter than jurors ordi-
narily have. (p. 297).

9. SAME—*Plaintiff May Testify He Would Not Have Made Verbal
    Contract if He Had Not Understood it Imposed Certain Ob-
    ligations.*

    A plaintiff in an action to recover on a verbal contract may
testify that he would not have made it, if he had not under-
stood it imposed a certain obligation upon the defendant.
(p. 297).

10.   TRIAL—*Instructions Authorizing Jury to Ignore Defendant's
      Counterclaim Erroneous.*

· An instruction given in an action in which the defendant
has asserted a claim against the plaintiff, by way of recoup-
ment or set-off, supported by evidence and exceeding the
amount of the demand of the plaintiff, in such terms as re-
quire a finding in favor of the later, if the jury believe his
demand to be well founded, is erroneous and presumptively
prejudicial, because it authorizes the jury to ignore the de-
fendant's claim, in arriving at their verdict.   (p. 299).

11.   NEW TRIAL—*Trial When Evidence Sustains Verdict for Plain-
      tiff, Directions of Verdict for Defendant and Motion Set
      Aside Properly Denied.*

When the evidence adduced in a trial, considered as a
whole, is sufficient to sustain a verdict for the plaintiff, re-
quests for peremptory instructions to find for the defendant
and a motion to set aside a verdict for the plaintiff, are
properly denied and overruled. (p. 298).

12.   LOGS AND LOGGING—*Recovery of Extra Compensation Under
      Logging Contract Because of Change in Method Held
      Proper.*

In an action to recover extra compensation for work done
·under a logging contract, upon the theory of a radical change
in the method of doing the work, made by the contractee,
after the commencement thereof, imposing very much great-
er cost of performance upon the contractor than would have
been required if the work had been done as contemplated,
and a modification of the contract so as to provide for such
compensation, in view of such change, there may be recov-
ery of the additional expense occasioned thereby, if the evi-
dence is such as warrants a finding that the contract was
made and subsequently altered agreeably to the theory and
claim of the plaintiff, even though there was no agreement
to pay for such extra cost, provided the declaration contains
an appropriate common count.   (p. 300).

13.   SAME—*Evidence Sustaining Finding As Basis for Recovery
      of Increased Cost Under Modified Logging Contract.*

If, in such case, the contract was verbal and adopted for
the purposes of the enterprise, subject to slight modifications,
a prior written contract made between the parties for the
purposes of a like enterprise fully executed and terminated,
by the terms of which the contractor was required to deliver
the logs within 75 feet of railroads to be constructed by the

contractee, and under which, evidence adduced tends to prove, he had constructed such railroads into the timber, as were reasonably necessary for convenient and economical stocking thereof; and there is evidence strongly tending to prove intent and purpose on his part, at the date of the making of the new contract, to construct a railroad clearly necessary for the purposes of the enterprise, in such sense, known to the contractor at the time, and his subsequent abandonment thereof, in consequence of which the contractor, in the discharge of his obligation to stock the timber, was compelled to log it by a route and to a point not contemplated, at greatly increased cost, the jury are justified in finding that the contract imposed duty upon the contractee to build such railroad, and that, in accepting performance in a manner different from that contemplated and occasioned by his change of plans, he incurred an obligation to pay the resultant increased cost.   (p. 300).

14.   EXCEPTIONS, BILL OF—*Paper Held a Bill of Exceptions Sufficient As to Form.*

A paper bearing the style of a case, entitled "Defendant's Bill of Exceptions," containing the evidence in such case, motions made and passed upon and what purport to be instructions, bearing the initials of the trial judge and notations of objections, rulings and exceptions, and certified by the judge, under the style of the case, as the bill of exceptions of the defendants therein, and made a part of the record of the case, by a vacation order, is a sufficient bill of exceptions. (p. 298).

15.   SAME—*Recitals Held to Make Instructions Incorporated in Bill Part Thereof.*

This recital in such certificate:   "being the exceptions to the rulings and actions of the court in the progress of said trial, as shown above and above set out;" makes the instructions so incorporated in such bill of exceptions, parts thereof. (p. 298).

Error to Circuit Court, Pocahontas County.

Action by Robert Cochran against George F. Craig and others.   Judgment for plaintiff, and defendants bring error.

*Reversed and remanded.*

*W. A. Bratton,* and *Price, Smith, Spilman & Clay,* for plaintiffs in error.

*F. R. Hill* and *L. M. McClintic,* for defendant in error.

POFFENBARGER, JUDGE:

The judgment for $8,537.39, under review on this writ of error, was recovered in an action of assumpsit, as part of an amount claimed under an alleged modification of a logging contract fully performed by both parties, the work having been fully done and fully paid for, except in so far as this claim has been asserted upon the theory of a modification of the contract, allowing increased compensation to the contractor. In his declaration, the plaintiff demanded $10,-636.84, and the defendants interposed a claim for $18,481.48, by way of recoupment and set-off. The basis of this counter claim is an alleged overpayment for the work done, at the contract price. Nine of the fifteen assignments of error are based upon the overruling of motions of the defendants to strike out evidence and their objections to admission of evidence. Some of these, as well as the thirteenth and fourteenth assignments, the former based upon the rejection of peremptory instructions asked for by the defendants and the latter, upon the motion to set aside the verdict, involve the sufficiency of evidence. The twelfth relates to rulings upon instructions given.

For the purposes of the stocking of the timber involved here, which was taken from a 3,500 acre tract of land known as the "Clark and McCullough Tract," and amounted to about 33,833,361 feet, the parties verbally agreed, April 2, 1915, or near that date, that a written contract between them dated, April 1, 1912, under which the plaintiff had stocked the remaining portion of timber on a 10,000 acre tract owned by the defendants, known as the "Hoffman Tract," and lying on the opposite side of the Greenbrier River from the "Clark and McCullough Tract," should govern and control their rights and duties, in the cutting and logging of the timber here involved, except in two particulars. The written contract had provided for payment of $4.75 per thousand for the spruce timber and $5.00 per thousand for the hardwood timber; and it was agreed that these prices should be increased $1.00 per thousand, making

the prices for all of the timber $6.00 per thousand for the hardwood, $5.75 for the spruce, and $4.25 for the hemlock, the last named price being that specified in the written contract. If this verbal agreement was not modified so as to provide for extra compensation, in view of an alleged alteration of the plans of the defendants, as is claimed by the plaintiff, the logging was fully paid for by the defendants, and the transaction completed and ended early in May, 1917, by payment of $4,592.54 to the plaintiff.

Under the agreement thus made, it was the duty of the plaintiff to deliver the logs within 75 feet of the railroad tracks as constructed by the defendants. Before it was entered into, the defendants indicated the extent and locations of the railroad tracks they expected to construct. Lying along the northwestern side of the Greenbrier River, the tract of land was penetrated by four small streams, hollows or ravines, known as the Arbogast, Reservoir, Waybright and First Run. Railroads were to be and were built up those hollows from the main line running along the river. A part of the timber lay in the head of another hollow known as Bear Wallow Hollow, which came to the river on an adjoining tract known as the "Boggs Tract." The timber in that hollow could not be logged down the hollow otherwise than by passing over the Boggs land. No railroad was constructed up that hollow, wherefore the timber therein was hauled over the ridge and brought down what is known as First Run Hollow. It amounted to a little over 2,000,000 feet and compensation for the logging thereof is the subject matter of the alleged modification of the contract and this action. The plaintiff contends his contract was made in view of clearly manifest purpose and intent on the part of the defendants, to obtain a right of way through the Boggs land and construct a railroad up Bear Wallow Hollow to which he was to deliver timber standing at the head or on the side thereof, and that his agreement based upon that assumption, imposed duty upon the defendants to construct it. He claims that, later, they attempted to obtain a right of way over the Boggs land, but, disagreeing with the owners thereof as to

the price of the right of way and some timber they desired to sell along with it, this purpose was abandoned, and that then an agent of the defendants agreed with him to pay for the stocking of the timber in that hollow, a sum equal to the cost of the right of way, construction of the railroad and removal thereof, in addition to the contract price, and further, that if such sum did not cover the cost of such logging of the timber, he was to be allowed the entire cost thereof. He claims it cost him $21,179.82, on which he has allowed a credit of $11,849.18, the amount paid him therefor under the contract at the prices agreed upon, and that there is a balance of $9,330.64, due him on which he has charged interest.

The defendants are partners doing business under the firm name and style of George Craig & Sons, and the firm is composed of George F. Craig, John A. Calhoun and A. J. Cadwallader. For many years, perhaps from the beginning of its operations, the firm's timber business has been managed by George F. Craig. He claims to have made the contract involved here with the plaintiff. On the other hand, the plaintiff contends that George C. Craig, son of George F. Craig, under authority duly conferred upon him, or under circumstances justifying plaintiff's reliance upon his agency, made the contract and afterwards modified it as aforesaid. The defendants deny the agency of George C. Craig and right in the plaintiff to rely upon such agency, and also the making of the alleged modification by George C. Craig and any attempt by him to make it.

The firm's principal office was in Philadelphia in which city George F. Craig, as well perhaps, as the other members thereof, resided. At their large mills located in Pocahontas County, West Virginia, a village, called Winterburn, grew up, and they maintained an office there. They employed a bookkeeper, Arbogast, a woods foreman, J. W. Bratton, a head-sawyer, Weightman, and others. From 1907 until 1914, George C. Craig resided there and was charged with certain duties in connection with the logging and mill operations. When he was first stationed there, he was a young man just

out of school, and one of the purposes in assigning him to that position was to give him business knowledge and experience. With the acquisition thereof, during that period of seven years, his authority may have been considerably increased from time to time. Nevertheless, it is insisted by both himself and his father, that his position was thoroughly subordinate and his powers as agent very limited. They say his powers extended only to the procurement of compliance with the contracts made by his father, on behalf of the firm, and not to the making of contracts. In the latter part of the year 1914, he discontinued his residence at Winterburn, but did not entirely sever his connection with the business carried on at that place. On his departure therefrom, his place was taken by a brother younger than he, Thomas R. Craig.

At the beginning of the transaction leading up to the Clark and McCullough enterprise, the firm did not own the timber on that tract and did not acquire title thereto until some time in April, 1915. Its situation being such that it could be conveniently logged to their Winterburn mills, they began investigations respecting it in 1914, according to the testimony of the plaintiff. He finished his contract for the logging on the "Hoffman Tract" some time in the fall of 1914, probably about September. He swears that, in November or December 1914, he and George C. Craig and J. W. Bratton, went over the Clark and McCullough land and made a rough estimate of the amount of timber thereon, for use in the firm's deliberations upon the advisability of purchasing it; and that, in connection therewith, he was asked for the prices at which he would log the timber, by George C. Craig, and that, in response to the inquiry, he proposed to log it at the prices and under the arrangement hereinbefore stated. He does not say Craig agreed on that occasion, on behalf of the firm, to pay the prices he had named; but admits that he told him he would report the proposition to the company. He denies that there was any further conversation or discussion with reference to the contract. George F. Craig admits that the plaintiff, Bratton and his son George looked over the timber, in a general way, in 1914. He also states that, on

previous occasions, he had negotiated with Clark for the pur-
chase of the timber. If the plaintiff's proposal was made at
the time stated by him, there seems not to have been any
further discussion of it, until about April 2, 1915. Between
those two dates, the plaintiff had assisted in making another
and more thorough estimate of the timber, which was reduced
to writing, dated, April 1, 1915, and signed by him and J. W.
McCullough and J. S. McQuown. When it was completed
and signed or was ready for reduction to writing, he was
called to Philadelphia. The title to the timber had not then
been acquired, but an agreement for the purchase thereof
was made about that time. The negotiations had so nearly
approached consummation that George F. Craig felt war-
ranted in contracting for the logging of the timber. Accord-
ing to his own testimony, the contract he made with the plain-
tiff was very informal. He admits the terms of the written
contract of April 1, 1912, were not discussed in detail. He
merely says he contracted with the plaintiff to cut and log
the timber on the basis of the contract of April 1, 1912, with
an increase of $1.00 per thousand for the hardwood and spruce
timber. On the other hand, the plaintiff says, the terms and
conditions of the contract were not discussed at all, and that
George F. Craig simply said to him: ''Start on the job as
soon as you can;'' or ''You can start this job as soon as you
like.''

George C. Craig admits that he went over the land with
the plaintiff in November 1914, and took his offer to do the
logging at the increased prices named and communicated it to
his father. He denies, however, that he made the contract
and also that he had any authority to do so. From what has
been stated, it is obvious that there is very little conflict in
the testimony as to the manner in which the contract was
made. The parties differ in their testimony as to who made
it on behalf of the firm, whether George C. Craig or George
F. Craig. In other words, the plaintiff's theory is that George
C. Craig made it and reported it to his father, while the
defendants claim he simply took and reported an offer which
they, through George F. Craig, accepted, April 2, 1915.

Since there is no controversy as to the original contract,

except in so far as the plaintiff claims it impliedly obligated the defendants to build the railroad up Bear Wallow Hollow, the conflict in the evidence as to who made it on behalf of the firm, has no important bearing on anything other than the extent of the agency of George C. Craig. If he had power to make it and did so, he had power and authority, no doubt, to interpret and modify it. If, on the other hand, he merely took the plaintiff's proposition and communicated it to his father for acceptance or rejection, the circumstance does not tend to prove the agency imputed.

There is sharp conflict in the testimony of the plaintiff and George C. Craig, as to what was said and not said, concerning the intention of the defendants to extend their railroad up Bear Wallow Hollow. They agree that they were in that Hollow and looked over the ground in November or December 1914. The plaintiff says it was agreed between them, that the railroad would be built up to a point known as the Jess McLaughlin Camp, and that the land above that camp was too steep for further extension. Craig says the land was too steep from the mouth of the Hollow up to the camp. He further says he ascertained the grade by means of a lock-level and informed the plaintiff that the road could not be so extended. This, the latter flatly denies, saying no levels were taken, that the grade was not ascertained and that it was not steeper than other places on which roads had been built under the old contract. Another witness swore the grade was not over 6%, nor as steep as other grades on which railroads were built under the contract. The plaintiff's testimony conflicts also with that of George F. Craig, as to what he said about the building of the road. The latter says he was on the Boggs land in the spring of 1916, and then told the plaintiff the road would not be built. This the former positively denies. This testimony conflicts with his son's, for it proves the building of the road was contemplated and the purpose not abandoned until the spring of 1916. Moreover, he did not say he declined to build on account of the grade. His testimony indicates a decision on account of the length of the road. He does not claim to have been in the hollow

at all.  As a document confirming his statement respecting the construction of the railroad to McLaughlin Camp, the plaintiff relies upon a letter from the defendant apparently written by George C. Craig, dated, March 8, 1915, and advising the plaintiff of the coming of a contractor intending to bid on the work and directing him to take the contractor over the route of the proposed road, "including the line over the old Horton grade."  The Horton Grade was an abandoned railroad bed running along the right hand side of the river and extending up into the Boggs land, at least as far as the mouth of Bear Wallow Hollow.  It did not extend to the Jess McLaughlin Camp, which was up in the Hollow.  It covered about half of the distance from the boundary between the Clark and McCullough land and the Boggs land and the McLaughlin Camp.  The probative value of this letter is denied in the argument on the ground that the Horton Grade did not reach the camp.  This circumstance does not wholly disprove its value.  The Horton Grade went up into the Boggs land and beyond the Clark and McCullough land.  There could have been no reason for extension of the road to the mouth of the hollow other than to make it a means of getting the timber out of that hollow.  The import of the letter is that there was a proposed road at that time and that it extended over the Horton Grade and into the Boggs land.  As to this, the letter was general and likely based on the assumption of the plaintiff's knowledge of the meaning of the terms, "including the line over the old Horton Grade."  It meant whatever they had previously agreed upon or discussed as that line.

The circumstances attending the negotiations resulting in the contract for the building of the railroads, are relied upon by the plaintiff, as tending to prove intent and purpose on the part of the defendants to extend the road to the McLaughlin Camp. They were constructed by a firm known as Notarianni and Aiello, under a contract dated, April 3, 1915, which did not specify the locations of the roads to be built. It provided in general terms for the construction of about six miles of railroad, at $2,000.00 per mile for grading and $525.00 per mile for track laying and surfacing.  The pros-

pective contractors for this work had gone over the ground
with the plaintiff, by direction of the defendant, in March
1915, and, among other locations shown them, was the one
in question. Aiello one of the contractors, says he and the
plaintiff went to the camp and came down the hollow to the
river, and that, while showing him that route, plaintiff had
said the railroad was to be built there. Under the contract
of April 3, 1915, railroad was built to the extent of 6.96 miles,
but it did not go to the McLaughlin Camp nor cover the Hor-
ton Grade, beyond the boundary line.

Aiello testifies that when they came to that line, in the
construction of what is called the river line railroad, in May
or June, 1915, Bratton, the woods foreman, came to them and
ordered them to stop at that point, saying they were unable
to secure a right of way through the Boggs land.  George C.
Craig admits that, in May or June of that year, he saw one
of the owners of the Boggs land and negotiated with him
for some timber thereon, not particularly for the right of
way, and that he saw him only once, and on the road be-
tween Winterburn and Franklin. He also admits that there
was some correspondence concerning the matter.  The plain-
tiff says that, in June, 1916, Boggs and George C. Craig
had an interview respecting the right of way, at Winterburn,
and that Craig expressing disgust at the conduct of Boggs,
had said he could not do anything with him, which meant,
or may have meant, that he was unable to obtain a right of
way from him.  Thereupon, the plaintiff, according to his
testimony, proposed to put the logs over the ridge, if the de-
fendants would give him what the railroad would cost, and
Craig replied: "If you will put them over the hill, we will
pay you what the railroad would cost, and if it costs more,
we will pay you."  As has been stated, George C. Craig
expressly denies this and, of course, if the agreement was not
made, it was never reported by him. George F. Craig admits
negotiations with Boggs for the timber and for a right of way,
prior to July, 1915.   He offered $600.00 and Boggs wanted
$1,000.00 which he was unwilling to pay.   Notwithstanding
the failure thereof, in May or June 1915, while the railroad
contractors were still there, George F. Craig, as has been

stated, testifies that, in the spring of 1916, after their departure, he and the plaintiff and Bratton went upon the Horton Grade and looked the ground over, and that he then and there decided not to build the road.    The railroads built were completed in September, 1915.    As will be observed, there is a discrepancy here in dates, the plaintiff saying his agreement, on failure to obtain the right of way, was made in June, 1916, and George C. Craig saying the negotiations for the right of way were had and failed in June, 1915.    Reconciliation of this conflict, as well as all others, was a question for the jury, of course.

There is no claim on the part of the plaintiff that his alleged agreement of modification was ever brought to the attention of George F. Craig, by him, in any way, until after the completion of the work, and the latter denies that it was. He specifically states that neither the plaintiff nor his son, George C. Craig, ever mentioned the matter to him.    It was brought to his attention, however immediately after the work was completed by a letter dated, May 7, 1917, acknowledging receipt of a check for the balance due.    In that letter, the plaintiff said: ''When George C. is at home you can write me and I will come over and we can settle the Run hauling,'' by which he admittedly meant the Bear Wallow Hollow hauling.    The suggestion of this claim, so made, does not seem to have occasioned any surprise on the part of the defendants, for, on May 11, 1917, plaintiff was invited to come, after having given a few days notice of the time of his arrival.    At that time, nothing was said about the counter claim of the defendants which later became a subject of negotiations. Between that date and February 20, 1919, the date of the rejection of the plaintiff's claim, he made two or three trips to Philadelphia, in an effort to obtain an adjustment of the matter.    Craig knew in a general way, what the plaintiff claimed, but says he was not informed as to the real basis of it until the occasion of the last trip.    Cochran says the Craigs were evasive and avoided a settlement.    They deny this, but a jury might well say they manifested no purpose to allow his claim without abatement and yet that they did not reject it.    In December, 1917, they introduced into the ne-

gotiations their set-off or counterclaim, and, from that time, both were under consideration, until the purpose of the plaintiff to bring this action became apparent. Then they informed his attorney by letter, that the logging contract had been closed and settled in full, April 30, 1917, except as to a charge for a car load of lumber, shipped to the plaintiff, May 29, 1917.

As matter tending to refute the good faith of the plaintiff's claim and contradict or negative the inferences arising in his favor from circumstances, the defendants invoke the monthly settlements and payments, and the final settlement and payment, without mention, until the receipt of the last check, of the claim now asserted. Uncertainty of the basis of his claim, or lack of full disclosure thereof, is also relied upon. George F. Craig swears he was not informed as to the exact nature thereof, until the last interview between them was held, though he admits he knew something additional or extra was claimed and discussed. In the last interview, he says what the railroad would have cost was claimed and $5,000.00 or $6,000.00 indicated as the amount. He admits that he neither admitted nor rejected the claim when asserted, but he says he told the plaintiff he would get the boys, including plaintiff's son, together and take up the proposition "as a whole and do whatever was right about it," evidently meanting both claims. It it said the claim for full reimbursement for the cost of taking the timber out over the ridge, whether it exceed what the railroad would have cost or not, is an afterthought and was never disclosed until this action was commenced. The basis of his claim as set forth in a letter written by his attorney, February 18, 1919, was limited to what the railroad would have cost.

George C. Craig was clearly an agent of the defendants. He was clothed with some authority. As the extent thereof was not defined by any written instrument and had not been otherwise clearly stated, it depended upon the facts and circumstances known to the plaintiff and the defendants. In the transaction here involved, he was sent to the scene of the operations frequently and upon important missions, and apparently had considerable authority, as clearly ap-

pears from the facts hereinbefore stated.    He gave the
plaintiff frequent and important directions.    Although he
had not made any of the former contracts with the plaintiff,
he had grown in age and experience at the time of the mak-
ing of the one here involved, and had been entrusted, in later
years, with more important matters than he had formerly
handled.    If right of recovery depended solely upon proof
of his actual or apparent authority, however, the evidence
thereof adduced and relied upon might not be sufficient to
sustain a verdict, and, for that reason, it might have been
the duty of the court to strike it out upon the motions made
for such relief.    But the existence of such authority as is
claimed is not the only theory of right of recovery.    There
is clear evidence of acquiescence by silence and entertain-
ment of the claim, after knowledge thereof, which    might
justify a finding of ratification of the alleged contract, if
made without authority.    Then there is still another theory
of right of recovery, yet to be mentioned.    As they are in
the case and were before the jury and the facts and circum-
stances relied upon as proof of actual or apparent authority
in George C. Craig, constitute some evidence thereof, the
court properly overruled the motions made to eliminate that
and much other evidence pertaining to the claim, and ap-
parently dependent upon the agency, such as what the rail-
road would have cost, the cost of logging the timber over the
ridge, and the making of the alleged agreement of modifica-
tion.    Evidence cannot be struck out on the ground of
slightness of its probative value, unless elimination thereof
is decisive of the whole case.    The trial court cannot be re-
quired, in the progress of a trial, to stop and weigh and pass
upon the evidence piecemeal, or reject certain portions there-
of on the ground of insufficiency, if it is relevant, material
and appreciably probative.    *State* v. *Clifford*, 59 W. Va. 1,
19, 23.    Such procedure would introduce insufferable de-
lays and confusion, endanger the rights of the parties and
likely invade the province of the jury.    Parties to actions
of this class are entitled to have their cases tried by juries
and to have all relevant and probative evidence passed upon
by the juries in the first instance.    Presumptively, the jury

will properly weigh and dispose of the evidence, whether heavy or light. The function of the court in the test of the sufficiency of evidence intervenes after verdict, or upon a motion to strike out all of it, before verdict, or upon a demurrer to the evidence, upon the theory of its insufficiency as a whole, not insufficiency of mere scraps or parts thereof. Such elimination of clearly insufficient evidence might not be reversible error under all circumstances, but a party cannot require it.

The overruling of a motion to strike out all of the plaintiff's evidence, made at the conclusion thereof, is assigned as error. As the defendants afterward introduced their evidence they waived the error in the overruling of the motion, if any. *Trump* v. *Tidewater etc. Co.*, 46 W. Va. 238; *Core* v. *Ohio River R. Co.*, 38 W. Va. 456.

Evidence of what it would have cost to build the railroad in question was objected to on the ground of insufficiency, abandonment of right to recover on that basis, possibility that such cost might have exceeded the cost of the work, and representation that the claim was for only four or five thousand dollars. The objection was properly overruled. The contract price per mile of the road built, except as to bridges, the length of the road, and a substantial increase in wages and the cost of materials between 1915 and 1916 were proved. Though this evidence did not fix a definite sum as the cost, it reasonably and fairly proved a large sum of money entering into the cost, and the plaintiff could not be denied right of recovery, on the ground of inability to prove the entire or exact amount thereof, if he made good his claim of a contract. It is immaterial that what the railroad would have cost might have exceeded the cost of the logging. If the contract was made as claimed, the plaintiff was entitled to recover it, nevertheless. There was no abandonment of this claim. Assertion of the alternative claim is not inconsistent with adherence to it, if that would be material. The law does not compel a plaintiff to elect at his peril between alternative claims. He may assert both, leaving it to the jury or court to say which he is entitled to. There is no element of estoppel in the representation that the claim

amounted to only $4,000.00 or $5,000.00, if made.    It was not acted upon in any way, to the detriment of the defendants.    As mere evidence, it was to be weighed by the jury with all the other evidence.

An objection to evidence of the additional cost of logging the timber over the hill, on the ground of lack of a claim of right to recover  on a *quantum meruit,* overlooks the presence of the common counts in the declaration and the legal proposition that deviation from   the contract admittedly made, by an alternation of the character of the work, after it was made, greatly increasing the cost thereof, may have conferred right of recovery on that basis.    Besides the evidence tending to prove the alleged modification   of the contract, there is an abundance of evidence tending to prove the admitted contract was entered into upon a representation of purpose and intent to build the railroad in question, and in reliance upon previous interpretation of the adopted written contract, as to the duty of the defendants,   respecting the building of railroads thereunder.    It suffices at this stage of the opinion, to note the presence of such evidence.    The question of its sufficiency comes up later.

Aiello's opinion that the cost of building the road in 1916 would have been 50% or 60% more than in 1915, was clearly admissible, notwithstanding he had done no construction work in West Virginia in 1916.    That circumstances went to its weight, not its admissibility.    As a contractor, he was familiar with general commercial and industrial conditions. A witness need not be qualified in the highest degree, nor in any particular degree, to make his opinion on a question of value or quantity admissible.    *Comstock* v. *Droney Lumber Co.,* 69 W. Va. 100.    It suffices that he has some peculiar qualification, more knowledge of the subject than jurors are supposed ordinarily to have.

Nor was the plaintiff's statement that he would not have taken the contract at the prices agreed upon, if he had not understood the road was to be built, inadmissible.    Though in the nature of self-serving evidence, it was not an extra judicial declaration.    It is part of his testimony, laying emphasis upon what he claims to have been a part of his con-

tract.    It deals with his understanding of it, his intention and purpose.    No rule forbidding such evidence has been adverted to in argument and we have discovered none.

Coming now to the rulings on instructions, it is necessary first to dispose of a contention on the part of the defendant in error, that the instructions were not made part of the bill of exceptions.    Indeed, it is insisted upon highly technical and unsubstantial grounds, that there is no bill of exceptions.    It would subserve no good purpose to analyze and refute this argument by demonstration and authority. A paper containing all of the evidence, motions, rulings thereon and the instructions, and styled "Defendant's Bill of Exceptions," was certified by the trial judge, as a bill of exceptions, and a vacation order makes it a part of the record. That is sufficient.    In that paper,   the instructions are copied, with the objections, exceptions, rulings and the initials of the judge, written on them.    These are referred to in the judge's certificate in these words: "being the exceptions to the rulings and actions of the court in the progress of the trial, as shown above and above set out." These words refer to everything that precedes them, in so far as they are applicable, and they are obviously applicable to the endorsements on the instructions copied in the paper. Those endorsements record objections, rulings and exceptions.

The correctness of only one of the two instructions given for the plaintiff is questioned.    It submitted to the jury the question of George ·C. Craig's agency and the issue as to whether he had made the alleged agreement and directed them, in the event of their finding for the plaintiff on those issues, to return a verdict in his favor and assess his damages at such sum as the evidence, in their opinion, warranted, but not to exceed the amount claimed in the declaration. It was a binding instruction and wholly ignored the issue as to the claims asserted by the defendants, by way of recoupment and set-off.    The evidence adduced in support of these claims had a clear tendency to sustain them.    Whether they were valid was a question for the jury in the first instance, as were all other issues in the case.    The defendants claim the amount of lumber sawed from the logs should have ex-

ceeded the quantity indicated by the scale under Scribner's Rule, by from 10% to 15%, and adduced evidence that it had done so in the timber taken from the Hoffman land. Plaintiff's attention was repeatedly directed to the fact that his scale was running too high, during the progress of the work. According to the evidence of the defendants, the lumber realized from the timber stocked by the plaintiff from the Clark and McCullough land did not overrun the scale at all. In resistance of this claim, the plaintiff assailed the correctness of the scale of the timber from the Hoffman land, and charged that quantities of timber had been left in the woods along the railroads and that logs had been lost from the mill pond or dam by reason of a flood in the river. In view of this evidence pro and con, neither court nor jury could properly ignore the issue.

If we could say the plaintiff had clear right to recover on the claim set up by him, that would not preclude the possibility of right in the defendants to part or all of their claim asserted against him. Nor can it be said the instruction did not literally require a verdict for the plaintiff on the whole case, if the jury were satisfied of the agency of George C. Craig and the making of the alleged agreement, and that necessarily precluded allowance of a large part of the claim of the defendants, which was nearly double that of the plaintiff. It was not in terms limited to the plaintiff's claim. In express terms, it hypothetically required a finding for the plaintiff on the whole case, but the vice of it was its failure to exclude the claim of the defendants in the hypothetical statement. If the set-off was valid *in toto,* there could have been no verdict for the plaintiff.

Such an instruction is erroneous and presumptively prejudicial. *Wiggin* v. *Marsh Lumber Co.,* 77 W. Va. 7; *Stuck* v. *K. & M. R. Co.,* 78 W. Va. 490; *Snider* v. *Robinet,* 78 W. Va. 88; *Petry* v. *Cabin Creek etc. Co.,* 77 W. Va. 654. It is not justified by the principle or rule enunciated in *Leros* v. *Parker,* 79 W. Va. 700. In that case, the instructions submitted conflicting contentions to the jury, hypothetically. Inconsistency in the theories advanced in them was relied upon as vitiating them. Here only one side has

been submitted by a binding instruction which completely ignores one of the defenses.

Exceptions were taken to the refusal of two instructions offered by the defendant, each of which would have directed the jury to find against the plaintiff, if given. They were properly refused. The contract as originally made between the parties was thoroughly informal. It verbally adopted the terms and provisions of a previous written contract between them, with two modifications as to prices. Under that contract, according to direct and positive evidence, railroads had been built by the defendants to such extent and in such manner as to bring them within reasonably convenient reach of the timber, when it was practicable to do so. As previously construed, it required the building of a railroad up the hollow in question. For about half of the distance, the grade was clearly not too steep, for a railroad had been operated on it. As to the balance of the distance, there is clear and positive evidence that the grade was not too steep. The jury could have found it was not. They could have found, also, that, when the plaintiff's offer to do the work was made and accepted, whether accepted by George C. Craig or his father, construction of the road was contemplated. There is no pretence that intention to build it was abandoned earlier than the month of June, 1915, two months after the contract was made. The plaintiff, Bratton and George C. Craig had examined the location in 1914. In March, 1915, he had been directed to take the prospective contractors over it and he did so. Within a few days afterward, the verbal contract was made, and it was silent as to the construction of that railroad as it was respecting the others. Presumptively, the defendants knew the plaintiff was basing his contract on his belief that they would build that road, and the jury could say they intended to accept the offer as he made it. He knew how the former contract had been interpreted and executed, in respect of the furnishing of railroad facilities, and had no reason to suspect that a different interpretation would be put upon it, or that it would be performed in a different manner. It is conceded that George C. Craig had supervising or administrative au-

thority within the contracts made by his father. It was his business to require compliance therewith.    That authority apparently, if not actually, included power to interpret provisionally, if not absolutely, the contracts in force and effect between the parties.    Considered in the light of previous experience under the logging contract, it could have been treated by the jury as a clear justification of plaintiff's reliance upon George C. Craig's representation that the road in question would be constructed.    It is immaterial that only "about six miles" of road was contracted for.    The plaintiff was no party to that contract.    Nor does it matter that nearly seven miles was built.    Silence of the logging contract as to what roads should be constructed and where is not conclusive.    It implied that there should be railroads constructed by the defendants.    Reason would suggest that it further implied an obligation to construct such roads as were reasonably necessary to convenient and economic logging of the timber, when practicable.    There is evidence that it was so construed in the stocking of the timber from the Hoffman land.    It would be as easy in logic and law to absolve the defendants from duty to build any railroads at all as to relieve them from reasonable duty in that respect.    In view of all this, it is obvious that the jury was justified in finding, or could have found, that the contract, as made, provided for construction of the railroad in question.

The material alteration made in their plans by the defendants, necessitating departure from the contract by the plaintiff, if so made, at great additional expense to him, imposed upon the former the legal duty of compensating him for his additional outlay in the execution of his contract as altered in performance, by reason of their change of plans. *Fuccy* v. *Coal and Coke Ry. Co.,* 75 W. Va. 134; *Henderson Bridge Co.* v. *McGrath,* 134 U. S. 260; *Woods* v. *Fort Wayne,* 119 U. S. 312; *Wolff* v. *McGavock,* 29 Wis. 290; *Salt Lake City* v. *Smith,* 104 Fed Rep. 457.

Having thus demonstrated the propriety of the rejection of the peremptory instructions asked for and the overruling of the motion for a new trial, we deem it unnecessary to inquire whether these rulings can be justified upon any other

ground, such as the validity of the alleged agreement of modification or ratification thereof as an unauthorized agreement, by silence, or acquiscence after knowledge. On these issues, there may be additional or different evidence on the new trial to be awarded, and the latter has not been very fully developed. While George F. Craig knew the plaintiff claimed extra compensation, it does not appear just when he was advised that the claim was based upon the alleged special agreement therefor. Ratification of an unauthorized agreement, by conduct, can be effected only after full knowledge of the facts. *Thompson* v. *Laboringmen's Manufacturing etc. Co.*, 60 W. Va. 42, 51. There was no duty on the part of the defendants either to affirm, deny or waive authority in George C. Craig, to make the alleged agreement, until they knew he had made it or a claim of liability was asserted thereon.

Failure to invoke the legal principle upon which the rejection of the peremptory instructions and the denial of a new trial are sustained and reliance upon other propositions, does not preclude application thereof. Litigation is not, and ought not to be regarded as a contest presided over by the court and determinable by the skill of the actors, as in the case of a game. A correct ruling based upon a wrong or untenable reason should always be upheld, and, when the rights of the parties have been dealt with and results declared, upon inapplicable legal principles, so as to work deprivation of right or infliction of wrongs, the reviewing court, on discovery thereof, should correct the procedure and either adjudge the rights of the parties upon correct principles, or remand the cause, with directions to the trial court for procedure agreeable to such principles, unless some insuperable obstacle to such action has intervened, and that is our practice.

In our opinion, the conclusions here stated cover and dispose of all the assignments of error that have been relied upon in argument, and sufficiently define the principles involved for the purposes of further procedure.

For the error in the giving of plaintiff's instruction No.

2, the judgment will be reversed, the verdict set aside and the case remanded for a new trial.

*Reversed and remanded.*