# CHARLESTON.

### W. E. DEEGANS COAL CO. *v.* LOGAN-POCAHONTAS FUEL CO.

Submitted May 8, 1923. Decided May 15, 1923.

1. APPEAL AND ERROR—*Verdict not Set Aside if, After Rejecting all Parol Evidence Offered by Party Against Whom Rendered, There is Sufficeint Evidence to Justify it.*

   This court will not set aside a verdict and award a new trial, a motion for which the lower court has overruled, if there be sufficient evidence to justify the verdict after rejecting all parol evidence offered by the party against whom verdict was rendered, in conflict therewith. (p. 36).

2. VERDICT—*New Trial—Refusal to Set Aside Verdict and Award New Trial Held Not Erroneous.*

   A case governed by the above stated rule. (p. 37).

Error from Circuit Court, Kanawha County.

Action by the W. E. Deegans Coal Company against the Logan-Pocahontas Fuel Company. Judgment for plaintiff, and defendant brings error.

*Affirmed.*

*Byrne, Littlepage & Linn,* for plaintiff in error.
*Deegan & Hall,* for defendant in error.

LIVELY, JUDGE:

Plaintiff in error, Logan-Pocahontas Fuel Company, prosecutes this writ of error from a judgment of the circuit court of Kanawha county, rendered on the 3d day of August, 1922, for $6,355.62, with interest, upon the verdict of a jury for that amount in favor of W. E. Deegans Coal Company.

This litigation is between two coal selling agencies, W. E. Deegans Coal Company, hereinafter called plaintiff, and Logan-Pocahontas Fuel Company, hereinafter called defendant, arising out of a contract for sale and purchase of coal entered into between them on May 18, 1920, and extending to June, 1921, a time when there was much commercial speculation in coal, resulting in as much litigation. Plaintiff had obtained a contract for the entire output of mines on Huff

creek in Logan county, hereinafter called Huff creek mines, and in turn contracted the entire output of the Huff creek mines to defendant in the May 18th contract; and defendant had contracted to sell this coal to Nottingham & Wrenn at Newport News, who were engaged in foreign shipments, and it is supposed that they had contracted to sell this coal to the Danish government. Defendant contracted to pay $5.25 a ton, afterwards. automatically raised under the terms of the contract, to $5.60 a ton. In December, 1920, the market price of coal declined, and finally reached a low figure. In the latter part of that month Nottingham & Wrenn evidently began negotiations with defendant by which for a cash consideration it could be relieved of the obligation of its contract, and on January 6, 1921, the defendant advised plaintiff by wire that it had been requested to ascertain on what basis plaintiff would agree to cancel the balance of the contract for the purchase of the Huff creek mines coal from that date; that Nottingham & Wrenn had in mind the payment of some reasonable sum as a cash payment, and defendant was asked to take the matter up with the Huff creek mines with a view to an adjustment as suggested. This suggestion was followed out by plaintiff, and it seems that the effort ended in fruition and the contracts were discontinued and the obligations thereunder adjusted between all the parties concerned. However, plaintiff and defendant could not agree upon the subject matter of this litigation which relates to 34 cars of coal which were shipped by plaintiff to Nottingham & Wrenn between January 3d and 7th, inclusive, upon a standing order for shipment of coal to that destination; and the question arising over the payment for these 34 cars was expressly reserved from the general adjustment, and afterwards, failing to agree on the claim for payment for the 34 cars, this suit was instituted.

The contract provided that the coal should be shipped by plaintiff on orders furnished by defendant, in the manner provided for in such orders and that defendant was to take the coal currently at all times, subject only to absolute embargoes preventing its movement from the mines. In order to prevent a congestion of unloaded cars at Newport News, and to

facilitate the prompt return of railroad cars from that point the dealers in coal shipments by water at that point, acting in conjunction with the railroad company, formed the New-port News Coal Exchange which issued permits for shipments of coal to that point as it could be reloaded on boats and taken away. To carry out this plan the railroad company established an embargo on the shipment of coal to that point, which was raised in favor of any shipper or consignee as the occasion demanded. This embargo was in effect in the latter part of December, and defendant, although it had given to plaintiff a standing order to ship the coal to Nottingham & Wrenn, was unable to get a permit from the coal exchange and have the embargo lifted so far as its coal was concerned. Both defendant and its consignee, Nottingham & Wrenn, were making efforts to obtain a permit for the coal and to have the embargo lifted. Plaintiff was so advised by defendant's general manager on December 31st stating that it had been advised by Nottingham & Wrenn that some modification would be made of the embargo as soon as transportation conditions would permit, and that their permit would be in-cluded among the first given consideration, and stating that defendant was making every effort to get the coal started to tidewater, and that everything possible was being done to keep the coal moving. Between that date and the 3d of January the Huff creek mines had loaded in the neighborhood of 30 cars, which were standing on the tracks awaiting shipment. On January 3rd the Exchange issued a permit to Nottingham & Wrenn, known as permit No. N-749 for 100 cars. It is claim-ed that this permit was erroneously issued by the Exchange and was intended for some other dealer. However, the rail-road company confirmed this permit and raised its embargo as against the Huff creek coal, its car distributor, Davin, at Huntington being advised of the issuance of this permit at 4:10 P. M. of that day. Plaintiff on that day had also re-ceived information of the permit and of its number and had transmitted the same to the mines which immediately began to bill out the coal it had on hand, to Nottingham & Wrenn under this permit, and continued to do so until the 7th of January, billing out in all the 34 cars in controversy, which

cars were taken first to Peach creek, the assembling point of the railroad, there received by the railroad company and assembled in trains for tidewater and shipped to that point. Defendant's main point of defense, around which all others revolve, is that plaintiff shipped out these 34 cars upon an illegal or erroneous permit, and therefore the shipment was made not in accordance with the contract, and defendant was not liable to pay for the same, for that reason; and it was attempted to show that plaintiff knew the permit was erroneous and that after it obtained information that there was no such permit it continued to bill out the cars until the 7th. This defense was not substantiated to the satisfaction of the jury. Gibson, Plaintiff's shipping clerk at Huntington, says he was first advised of the permit over the telephone from defendant at Charleston; that he immediately directed the mines to bill the 34 cars in question to Nottingham & Wrenn. Vass, president of plaintiff company, says he learned from the shipping department that defendant had advised them on the 3d that the permit had been issued. Belch, shipping clerk at the mines, was notified of the permit on the 3d, and immediately billed out a number of the cars in question, in accordance therewith. On the contrary, defendant's officers testified that the first information they had of the permit was from defendant at Huntington on the 4th of January, and advising that twenty-six or twenty-seven cars were being shipped out, giving the numbers thereof, the loadings and the destination. It appears that on the 4th of January the railroad company discovered that the permit was an error and in the forenoon of that day advised its car distributor at Huntington, who transmitted that information to Mahle, its agent at Peach creek. Davin says his records show that on that day the railroad company refused to receive the 11 cars which had been billed on the 3d, and that this information was conveyed to the mines through his agent at Peach creek. We do not find that this agent at Peach creek was introduced as a witness; and the fact remains that the railroad company did actually receive all of these cars and transport them. Davin says he inquired of Mahle if he had notified the mines that the permit had been cancelled and was informed by

Mahle that he had never said anything about it to any one. The witnesses for plaintiff say they never knew that the permit was erroneously issued or that it was cancelled until after the 34 cars had been shipped and were on their way to their destination. Corroborating Gibson is the testimony of Davin and Calloway, witnesses for defendant ,that the usual method of information of the permit would be through Nottingham & Wrenn to defendant at Charleston, thence to plaintiff and thence to the mines. On this conflict of fact the jury has passed, and on this writ of error we must take the statement of plaintiff's witnesses as true. But what difference does it make as. to how plaintiff received the information that a permit had been granted? It is unquestioned that there had been a permit granted to Nottingham & Wrenn for the shipment of 100 cars of coal to Newport News. It may have been an error, but it was surely not the fault of plaintiff and it could not be held responsible for that error. If it was an error, and the evidence on the point is not very satisfactory, it was occasioned by the error of the Exchange or the railroad company or possibly both. Whether plaintiff was informed that the permit was revoked before it made the shipment is also a quetion of fact which has been resolved in favor of plaintiff; and there was ample evidence on which the jury could base this finding. Plaintiff's officers and witnesses say they never knew that the permit had been revoked until after the cars were shipped; and the evidence of Davin only goes to the extent that his record shows that he had notified the agent at Peach creek to that effect. There is no attempt to show that notice of this cancellation was actually received by the plaintiff or at the mines. This point of defense was accentuated in an interrogatory propounded by defendant and submitted to the jury, as follows: "Were the 34 cars sued upon in this case shipped in accordance with the terms of the contract sued on and exhibited in this case?", to which the jury answered, "they were."

On the whole case the evidence shows that defendant had contracted to buy this coal and had directed that it be shipped to its purchaser, Nottingham & Wrenn, at Newport News, and that it was so shipped and sold by Nottingham & Wrenn

on the open market at a net price of $2.00 per ton; that plaintiff was not responsible for the error, if any there was, of the issuance of the permit No. N-749; that there is ample evidence, which, on a motion to set aside the verdict, must be taken as true, that plaintiff had no knowledge of any irregularity in the issuance of the permit, or that the permit had been recalled, until after the shipment of the 34 cars had been made in good faith; that defendant was promptly notified of the shipments and made no objection thereto until the 9th of January, when it appears by a telegram from defendant to plaintiff on that date that Nottingham and Wrenn had repudiated their contract with the defendant and that defendant had determined to repudiate its entire contract with plaintiff and would not be responsible for payment for the coal shipped in the month of January.

At the conclusion of the evidence, the defendant, in addition to the interrogatory above set out, propounded interrogatories Nos. 2, 3 and 4, which are as follows.

Interrogatory No. 2: "Were the 34 cars sued upon in this case shipped in accordance with the rules and regulations governing tidewater shipments?", to which the jury answered: "Yes, we regard hauling of coal by C. & O. as an acceptance of Newport News Coal Exchange permit N-749."

Interrogatory No. 3: "Was there a valid effective permit to ship coal to tidewater for the account of Nottingham & Wrenn (or Logan-Pocahontas Fuel Company) at the time the 34 cars sued upon in this case were shipped from Huff Creek Mines?", to which the jury answered : "Yes."

It is argued that the answer to this interrogatory, while not in conflict with the general verdict, is directly in the face of the uncontradicted evidence at the time of the shipment of 23 of the cars, ostensibly under permit N-749, that there was in fact no such permit in existence, and therefore the coal was not shipped in accordance with the rules and regulations governing tidewater shipments. We fail to see the force of this argument. So far as plaintiff was concerned there was a valid permit in existence at the time all of the cars were shipped. It did not know otherwise and was acting innocently, if the jury believed that the evidence of plaintiff

was true to the effect that it was not advised that the permit actually issued was erroneous or that it had been cancelled. Evidently, the jury took the view that the permit was valid in the sense that it relieved the plaintiff from any irregularity or for violating the rules and regulations governing such shipments.

Interrogatory No. 4: "Did the C. & O. Railway make an exception in favor of a permit to ship coal to tidewater for the account of Nottingham & Wrenn as relates to the 34 cars?" Answer: "Yes, we regard hauling of coal by the C. & O. as an acceptance of Newport News Coal Exchange Permit N-749." It is argued that the evidence plainly discloses that this permit was not in existence on January 5th, 6th and 7th, that the jury did not understand the nature of a permit and that because they regarded the action of the railroad company as an acceptance should not bind the defendant as against the actual fact of the non-existence of any permit whatever. As above suggested, we cannot see why plaintiff should not recover when it shipped the coal on the order of defendant and in good faith, believing that a valid permit was in existence. To penalize plaintiff some fault or dereliction must be shown on its part. It was not at fault. The errors of others, the railroad company or the coal exchange or defendant itself, cannot avail to defeat its recovery.

The principle of law governing this case is well established. The controversy is based on a conflict of evidence, and the criticism of the jury's finding is that it has not correctly decided on the facts. In such instances where the verdict has been rendered and motion made to set aside the verdict all of the evidence of defendant which is in conflict with that of plaintiff must be disregarded; and if there be sufficient evidence on the part of plaintiff on which to base the verdict, it must stand. *Smith* v. *Townsend,* 21 W. Va. 486; *Cochran* v. *Craig,* 88 W. Va. 281.

Was the controversy properly submitted to the jury? Defendant assigns as error that the court refused to permit it to introduce evidence that plaintiff had, some time in December, consigned coal as "inland east" coal, to Nottingham & ·

Wrenn at Richmond, Virginia, and in this way avoided the embargo and made an illegal shipment. The court refused to permit the evidence of alleged illegal shipments which had no connection with the 34 cars in question. It is argued that such evidence would tend to show that plaintiff had billed out the 34 cars illegally, and in vioaltion of the transportation rules. We think the court properly refused to admit this evidence which was proffered in a general sort of way. It would have, of course, been met with evidence by plaintiff, and thus there would have been introduced confusing issues. All matters arising under this coal contract, except the 34 cars in controversy had been amicably adjusted. Evidence of misunderstandings or illegal shipments on other occasions would have had little bearing or effect upon the positive fully developed evidence as to the 34 cars.

Complaint is made of the refusal to allow Calloway, a witness for defendant, to state whether plaintiff, after the 24th of December, the time when they were directed to ship only to tidewater, had billed coal to Nottingham & Wrenn at any other point than tidewater. This question was for the purpose of contradicting Vass, a witness for the plaintiff, who stated on cross examination that he did not have any knowledge of shipment of coal to Richmond, Virginia, consigned to Nottingham & Wrenn. Even if the foundation for a contradiction had been properly made, it was on a collateral matter, and was properly refused.

Another assignment of error is that the court refused to permit defendant to introduce to the jury its exhibit No. 20 in its entirety, as tending to show the termination of all contractual relations between petitioner and respondent from and after January 10, 1921. That fact was not in controversy. It was admitted by plaintiff, and there was no use of proving it.

The refusal of the court to give the instructions offered by the defendant is assigned as error, but we find no insistence upon this point, no discussion of the instructions in the brief, and under the well known rule, that assignment of error will not be examined.

We find no reversible error, and therefore the judgment will be affirmed.

*Affirmed.*