## TIBBETS & PLEASANT, Inc., v. COOK.

No. 19447. Opinion Filed May 6, 1930.

102

Allen, Underwood & Smith, for plaintiffs in error.

Walter L. Gray, for defendant in error.

BENNETT, C. This appeal is prosecuted from a judgment of district court of Osage county in favor of defendant in error, hereinafter called plaintiff, against plaintiffs in error, hereinafter called defendants, for $1.300 damages for the alleged negligent killing by defendants of two horses belonging to plaintiff. It was alleged that these animals were struck and killed by one of defendants' trucks while said animals, along with several others, were being driven across the public highway from a pasture situate on the south side into a pasture situate on the north side of said road. The accident occurred about 5 o'clock p. m., November 26, 1926. On said date defendants were building a hard-surfaced road from Fairfax, Okla., towards Ponca City, and in connection therewith were using trucks in hauling building material over said highway from a nearby rock crusher.

It was alleged that one of the animals was four and the other was five years old; that they were worth $1,300, and that they were kept in the pasture of one Tate on his farm in Osage county. The petition is otherwise in the usual form describing the horses and their performance upon several race tracks, including Dorval Park race track in Montreal, the Jefferson Park race tract at New Orleans, etc., where they were more or less successful in winning purses.

It was alleged also that on the evening of the accident a truck of defendants was being driven by their employee, Northup, along said highway between the pastures in which these horses were kept, at a careless and reckless speed of not less than 35 miles an hour; that said truck was not equipped with proper brakes by which it could be stopped, and that said employee, while engaged in the performance of his duties in operating said truck as indicated, negligently ran into said horses, and either killed or so maimed them that they had to be killed.

Defendants' answer denies generally the petition, and alleges that if the animals were injured as alleged, said injury was due to plaintiff's negligence in allowing them to go unrestrained upon the public highway in violation of the herd law of Oklahoma.

The undisputed evidence discloses that the horses were kept by Mr. Elmo Tate in his pasture on the south side of the road during the day, and at night they were moved across the road into an alfalfa pasture; that the gates of the two pastures were substantially opposite each other and separated only by the highway running east and west which was about 60 feet in width. Mr. Tate and his young son were driving the animals across the highway from the south to the north pasture at the time of the accident. Mr. Tate's son was on horseback in the south pasture and driving the animals out of said pasture and Mr. Tate was standing near the south gate on the edge of the road; that there were from 12

to 15 horses in the bunch proceeding in a walk across the road; part of them had reached the gate of the north pasture, the others extended in a line across the road perhaps to the gate of the south pasture. The animals were walking close together in single file, or, as described by one witness, the head of each horse was about opposite the flank of the horse preceding him. The truck, described as a Ford with dump body, came down an incline along the highway from the west. The highway was straight and unobstructed for a distance as shown by the proof from 200 yards to one-half mile.

The evidence is contradictory as to the speed of the truck, plaintiff's evidence indicating a speed of 35 miles; defendants' evidence indicating 20 miles per hour. The truck ran into the group of horses at a point about the middle of the string hurling one of the horses into the ditch north of and parallel with the highway and throwing the other in a southeasterly direction, the first horse being killed and the other maimed in such fashion that it had to be killed. One of the horses was stricken along the side and shoulders and the other back towards the rump breaking the legs. The evidence of plaintiff is to the effect that the truck ran for 100 or 200 yards past the scene of the accident before it stopped. The evidence of defendants is that it stopped within an equal number of feet. Plaintiff's evidence is to the effect that the driver came back immediately after the accident and said that the car was beyond his control, and that he had no brakes that were effective. The defendants' evidence is a denial of this: the driver testified that he had good brakes in perfect condition, but that in coming down the incline towards the place of the accident, his engine died, and that he was running so fast that he could not put the same back in gear and without which his footbrake would not operate and he could not stop; that the car was not equipped with any emergency brakes. The driver and his companion state that every effort was made to stop the car, but that by reason of the fact that the engine could not be thrown back into gear, the car could not be stopped.

Defendants' evidence does not disclose that the driver was able to slacken materially the speed of the car as it approached the animals. However, his companion indicated that perhaps the car was slackened very slightly. The driver and his companion saw the horses, but simply could. not stop the car.

It was in evidence also that the driver of the truck was not familiar with the road; that he began to drive this truck at noon on the day of the accident. He says also that one of the animals was located near the end of an automobile standing on the south side and immediately east of a point opposite the gate of the south pasture, and that this horse seemed to dodge in front of his truck.

As to the value of the animals, plaintiff introduced a number of men who had had from five to 40 years' experience with race horses. All testified as to the value of these animals. Some of them had seen the animals and others had not seen them but knew of their breed and of their performance. The evidence is that the animals were thorobreds of the best blood to be found in the country. Some of these witnesses base their value upon the use of these horses as race horses, and others upon their use as brood mares, and others simply give the estimate of their value generally. It is sufficient, however, to say that no value placed upon these animals by any witness is less than the amount of the recovery by plaintiff in this action. These horses had been in that community for a year or more, but defendants offered no proof whatever as to their value or as to their performance or in contradiction of the evidence of plaintiff with respect to the value of these animals.

Defendants in their brief argue: First, that plaintiff's evidence was not sufficient to establish any negligence on the part of defendant. This contention is without any semblance of plausibility. All the plaintiff's testimony here shows that Northup was driving down a long incline with an unloaded Ford truck and that the road was straight, open and unobstructed for a distance of a quarter of a mile or half mile; that 12 or 15 horses were proceeding in a leisurely fashion across the highway in front of the oncoming vehicle; that the animals were going out of a pasture on the south of the road and into a pasture on the north side of the road through gates in the respective pastures practically opposite each other and distant from each other about 60 feet; that there were in the group of animals 15 or 18 horses walking, as the evidence indicates, "strung out." The oncoming truck ran into the middle of the string of horses, killed two and ran a distance of 100 or 150 yards beyond the place of accident before stopping. Plaintiff's evidence is that the driver stated, in substance, that he had no effective brakes and could not stop on that account. The driver himself says that he could not stop because he was running so fast that he could not put

his engine in gear, and that his footbrakes were not available for efficient use because the engine was not in gear, and that the truck was not equipped with emergency brakes.

If there can be conceived a case involving stronger evidence of negligence, we can hardly imagine it. To permit the operation on a public highway of a motor vehicle, capable of high speed and without effective brakes, or to permit a driver to operate such a vehicle without a knowledge of, or without the disposition to properly apply such brakes, is unthinkable. Such a vehicle would overtake and run into a funeral procession or a group of school children who were on or using the highway. Defendant contends, it seems, that his negligence, if any, was not the proximate cause of the injury. What else could have caused it? It was daylight, his vision was unobstructed, he saw the horses, he ought to have been able to either stop or turn aside his vehicle. He observed the pace of the horses. His own speed, as compared with theirs, was terrific. The caretaker of these horses had the right to drive them across the highway. They were not running astray, nor is there a word to indicate that they were out of the path across the roadway leading from the gate of the south to the gate of the north pasture. We must assume that if these horses had been elephants, the driver would have run into them with the same reckless disregard. If the driver had the effective means to stop the car under the circumstances and he failed to do so, it was gross negligence, if not, indeed, a criminal act. If, on the other hand, the truck was not equipped with effective brakes so that the driver could stop the empty truck within time to avoid striking the animals thus proceeding across the highway and under the facts here, it is outrageous negligence on the part of the owner of the truck, and argument to the contrary is vain and useless.

Defendants suggest that the plaintiff was negligent in driving the horses onto the highway in violation of the herd law; but in his brief we are furnished with no citation giving us the book and page of any such law, nor are we favored with any decision which intimates that the plaintiff did not have the right to do just what was being done in this instance. At this point it might be well to call to mind the ancient case of Davies v. Mann, 10 M. & W. 546 (152 Reprint, 588, 19 E. R. C. 190) wherein the facts were that plaintiff had negligently turned his donkey out on the highway with its feet hobbled, and the defendant ran into it with his vehicle and injured it. That case, if not the origin, was the first outstanding decision which emphasized our wholesome doctrine of "last clear chance." Assuming that plaintiff was negligent in driving his stock upon the highway, it gave to the defendant no sort of right to run over and kill them. Such a contention is sufficient to shock the sensibilities of ordinary men.

It is defendants' second contention that "plaintiff's witnesses were not shown to be qualified to testify as to the value of the animals in controversy as race horses," etc. Several witnesses testified to the value of these animals, a number of them had seen and known the animals, knew of their breeding and performance. One or two of the witnesses had not seen the particular animals, but knew their breeding and knew of sales of animals of similar breeding and training through the various sales reports of blooded stock.

In Alabama Great Southern R. Co. v. Mims (Ala.) 92 So. 548 (1922), the second paragraph of the syllabus is as follows:

"A witness who had kept posted on the price of cattle and was familiar with the price of high-bred registered cattle, having attended most of the state sales during the past year, was competent to testify as to the value of a registered cow killed by defendant's train, though he had never seen the cow."

In the case of Cochran v. Craig, 88 W. Va. 281, 106 S. E. 633, the court says:

"To make the opinion of a witness as to value or quantity admissible in evidence, he need not be qualified in the highest degree, nor in any particular degree. It suffices that he has more knowledge of the subject-matter than jurors ordinarily have."

In 3 Jones' Commentaries on Evidence (2d Ed.) p. 2491, sec. 1363, the author says:

"It has been well said that there is no rule of law, and there can be none, defining what a witness must know of property before he shall be permitted to give an opinion regarding its value. It may only be observed, generally, that the expert must show a sufficient foundation of special knowledge to serve as a reasonable basis for an opinion, after which the determination of the weight to be accorded such opinion is a question for the jury." Citing many cases under note 14.

At page 2492, under section 1364, the same author says:

"It has been held in some cases that knowledge sufficient to qualify the witness as an expert may be derived from market reports. (Citing cases under note 20). Moreover, it is not necessary that an expert should have seen the land or article in

question or have personal knowledge concerning it. (Citing cases under note 1). His knowledge may be gained by having dealt in similar property, although at another place." (Citing cases under note 2).

At page 2333 of the same author, and in par. 1266, it is said:

"In cases where the value of property which has no fixed market value is involved, witnesses can only state what, according to their best judgment or belief, they consider it worth." (Citing Erd v. Chicago, etc., Ry. Co., 41 Wis. 65.)

In the case of Sanders v. Pinney (Wash.) 174 Pac. 471, a witness was allowed to testify to the cost of logging and the market price of logs where the witness was shown never to have been on the premises.

In Burlington & M. R. R. in Nebraska v. Campbell (Colo.) 59 Pac. 424, witnesses were held competent to testify as to the value of plaintiff's horse, though they testified that there was no market value and did not know the market value of the same. The court says:

"The witnesses who testified as to the value of the mare were owners of similar animals, used them, and had for years, in their occupation as farmers; had bought them, and in some instances, sold animals of this character; and we think that under such circumstances, their opinion as to the value was competent, and of weight, and should not be rejected because there did not happen to be an established and general market value for such animals in that community, there being no person in that neighborhood engaged actively in the business of buying and selling horses, so as to establish a market value." (Citing Railway Co. v. Williams, 3 Colo. App. 526, 34 Pac. 731; 2 Suth. Dam. sec. 654.)

In Union Pac., D. & G. Ry. Co. v. Williams (Colo.) 34 Pac. 731, the plaintiff was allowed to testify as to the value of his horse that was killed. He was not a horse trader, although he had traded in horses in a way and was fond of horses; he had seen horses bought and sold at public and private sale. The court said:

"We think that, as the owner of the horses, he laid a sufficient foundation to enable him to testify as to their value. Other witnesses, who stated that they were acquainted with the value of horses at the time, corroborated him. The appellant was probably not dissatisfied with his valuation of any of the property, because it offered no evidence and made no effort to reduce such valuation." (Emphasis supplied.)

See, also, Bell v. Tackett, 134 Okla. 164, 272 Pac. 461; Turner-Tulsa Co. v. H. Schnell & Co., 107 Okla. 125, 230 Pac. 918.

There was ample evidence as to the value of the horses destroyed in this case. Much of it was not subject to the criticism of defendants, and since the jury gave to the plaintiff less than the valuation of the horses fixed by any witness in the case, the verdict could not be held excessive. Certainly we would not be warranted in this state of the record in reversing this cause, even if improper evidence as to value had been given by some of the witnesses. Section 319, C. O. S. 1921.

It is suggested in the brief that it was error for the court to admit evidence as to what the driver told plaintiff and his witnesses immediately after the accident with reference to his brakes. This was a few moments after the injury and perhaps would be held a part of the res gestae, but, at any rate, the driver testified as a witness to substantially the same facts, although he denied the conversation, and the same, therefore, could not constitute reversible error.

We have read carefully the entire record in this case, and have considered the briefs of defendants, and we are clearly of the opinion that no substantial error has been pointed out in the trial of this case. Wherefore, the judgment of the trial court is affirmed.

TEEHEE, LEACH, FOSTER, and DIFFENDAFFER, Commissioners, concur.

By the Court: It is so ordered.

Note.—See under (1) anno. 1 L. R. A. (N. S.) 223, 224; 14 L. R. A. (N. S.) 251; 48 L. R. A. (N. S.) 946; 2 R. C. L. p. 1187 et seq.; R. C. L. Perm. Supp. p. 653. (2) 11 R. C. L. pp. 574-577; R. C. L. Perm. Supp. p. 2949. See "Appeal and Error," 4 C. J. §2847. p. 871. n. 9; §2941, p. 960, n. 94. "Evidence," 22 C. J. §733, p. 639, n. 27. "Motor Vehicles," 42 C. J. §986, p. 1195, n. 12.